UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

LILLIAN NASH,                              )
                                           )
            Plaintiff,                     )
                                           )
v.                                         )        Civil Action No.: 1:12-cv-278
                                           )
GREEN TREE SERVICING, LLC,                 )
et al.,                                    )
                                           )
            Defendants.                    )

## MEMORANDUM OPINION

This matter comes before the Court on parties' cross-motions for Summary Judgment:

(1) Defendant Commonwealth Trustees, LLC's ("Commonwealth") Motion for Summary

    Judgment (Dkt. No. 85) as to Count VIII;

(2) Defendant Litton Loan Servicing, LP's ("Litton") Motion for Summary Judgment (Dkt.

    No. 84) as to Counts I, II, and Count III[1];

(3) Defendant Green Tree Servicing, LLC's ("Green Tree") Motion for Summary Judgment

    (Dkt. No. 88) as to Counts IV, VI, and VIII;

(4) Plaintiff's Lillian Nash's ("Nash" or "Plaintiff") Amended Motion for Summary

    Judgment (Dkt. No. 115) as to all remaining Count: I, II, IV, VI, and VIII.

Following the Court's Order (Dkt. No. 44) granting in part and denying in part Defendants'

Motions to Dismiss, there are five remaining counts against Defendants. Count I alleges breach

of contract against all Defendants. Count II alleges tortious interference with a contract by

---

[1] Defendant Litton's Motion as to Count III is denied as moot. Count III of the First Amended
Complaint (Dkt. No. 17) included a claim for unconscionability against all defendants. The
Court's Order (Dkt. No. 44) docketed June 28, 2012 dismissed Count III for the reasons stated in
open court.

Litton.  Count IV is brought against Green Tree and Litton and seeks a declaratory judgment finding that Nash is not in default on her loan.  Count VI alleges Green Tree violated the Real Estate Settlement Procedures Act ("RESPA").  Finally, Count VII alleges Green Tree violated the Fair Debt Collection Practices Act ("FDCPA").

Arguments were heard before the Court on February 15, 2012.  All motions were opposed, except for Defendant Commonwealth's Motion for Judgment as a Matter of Law (Dkt. No. 85).  Commonwealth sought Judgment as a Matter of Law on the sole remaining count against it, Count VIII, which alleges that the notice of foreclosure sent by Commonwealth to Nash violated 15 U.S.C. 1692g(a)(1)-(5).  Defendant's motion is unopposed.  For good cause shown, Defendant Commonwealth is entitled to Judgment as a Matter of Law on Count VIII of the Complaint.

## Background

On December 26, 2007, Plaintiff Lillian Nash received a loan from SunTrust Mortgage, Inc. ("SunTrust") to purchase property at 10813 Campaign Court in Manassas, Virginia.  Her loan is evidenced by a note for the original amount of $238,500.00 payable to SunTrust.  The note is payable over thirty years and provides for monthly payments in the amount of $1,546.91 beginning in February 2008. *See* Am. Compl. Ex. 2.  Mortgage Electronic Registration Systems, Inc. ("MERS") was the initial beneficiary under the Deed of Trust. *See* Compl. Ex. 1.

On May 1, 2008, SunTrust transferred servicing rights on the loan to Litton.  Nash's unpaid principal balance at the time was $237,880.49.  On January 27, 2010, Nash received a Home Affordable Modification Program Trial Period Plan ("TPP") offer.  The offer begins by stating, "you may qualify for a Home Affordable Modification Trial Period Plan" but continues on to provide "[d]etailed instructions on what you need to do to take advantage of this offer,"

2

which had been "customized" for Nash based upon previously submitted financial information. *Id.* at 1; *see also id.* at 2 ("Please let us know . . . that you accept the Trial Period Plan."). The agreement provides for payments in the amount of $1,519.08 per month,[2] for March, April, May, and June 2010, "instead of, not in addition to, your normal monthly mortgage payment." *Id.* It goes on to note: **If you fulfill the terms of the trial period including, but not limited to, making trial period payments, we will waive ALL unpaid late charges at the end of the trial period.**" *Id.* (emphasis original). Finally, within a frequently asked questions section, it provides that if a trial period payment is less than the payment currently owed, the difference between the current monthly payment and trial period payment will be added to your modified loan balance. *Id.* at 5.

The agreement provided that after Nash signed and returned the TPP to the lender, the lender would (1) send her an executed copy of the plan if she qualified or (2) send written notice that she did not qualify. It states, "[t]his Plan will not take effect unless and until both the Lender and I sign it and Lender provides me with a copy of this Plan with the Lender's signature." *Id.* at 5. Nash never received a signed copy of the plan or notice that she did not qualify. Nonetheless, borrower and lender proceeded as if the TPP had been executed, with Litton sending Nash monthly statements that included a note "You are currently in a Trial Period Plan" and providing for payment in the lower TPP amount.

Plaintiff maintains she entered into the TPP and made the required payments during the trial period, which ran from February 2010 until August 2010 (four months longer than the typical TPP), when Litton informed Nash her request for permanent modification had been denied. During the TPP, Litton was to hold Plaintiff's payments until they were enough to pay

---

[2] The agreement notes: the $1,519.08 "includes payment for Escrow items" of U.S. $253.16. *Id.* at 7.

her oldest delinquent monthly payment in full.  Plaintiff had no delinquent payments when she entered into the TPP, so she maintains the payments should have applied to her balance at the time each payment was submitted.  Litton maintains that upon the denial of Nash's request for a permanent modification, the entire deficiency between the normal monthly payments and the lower TPP payments became due immediately.  Because her TPP payments were lower than contractual payments, her account became delinquent.  The terms of the TPP allowed that the payments during the TPP would go into a suspense account.  Once the suspense account contained enough to make a full contractual monthly payment, the monthly payment would be made. Because Nash was paying less than the contractual amount, this led to her becoming behind in her payments—possibly in default.  As Nash points out, however, the monthly statements Litton sent her at the time do not reflect Litton's post hoc accounting, her monthly statements from February–August 2010 reflect a suspense balance of $0.

When Litton denied Nash's application for a permanent HAMP modification in August 2010, they cited her failure to provide current bank statements with beginning and ending bank balances.  Nash claims that she faxed a 24-page document to Litton that contained her bank statements, but Litton claims it only received 18 pages of the facsimile.  By that time, because Nash had enrolled in the TPP but had been rejected from a permanent modification plan, according to Litton, she was paid in full only through May 2010.  Her suspense account purportedly contained $1,717.09, but she owed payments for June, July, and August.  Thus, by complying with the terms of her agreement with Litton, Nash was now in default and three months behind on her monthly loan payments.

By November 10, 2010, Litton provided Nash with a Notice of Default and Intent to Accelerate. *See* Compl. Ex. 14. The notice informed her that she needed to pay $6,482.27 within

4

45 days to bring her loan current or Litton would accelerate the note and declare all outstanding amounts payable. Nash continued to pay what appears to be the contractual amount due. By December 2010, Nash was current on her contractual payments through September 1, 2010 with a suspense account balance of $1,863.15. *See* Am. Compl. Exs. 6, 15. Litton applied the $1,863.15 suspense account funds to her delinquent debt, resulting in a total amount due of $4,617.79 as of December 29, 2010.

Nash also takes issue with a few discrepancies in the application of her payments and the amounts owed. First, Plaintiff made no payment in April 2010, because her March 2010 monthly statement stated that no payment was due until May 1, 2010. *See* Am. Compl. Ex. 8 (Plaintiff's March 2010 statement indicates her next payment is due May 1, 2010). The initial agreement, Ex. 5, did provide for an April payment, but the statement Nash received in March did not. This apparent mistake on Litton's part increased the amount due in August when Litton denied her permanent modification.

There was a similar discrepancy in Nash's escrow payments. Under the TPP, Nash's escrow payments were reduced to $253.16, which Litton represented was included in her TPP payment of $1,519.08. *See* Compl. Am. Ex. 5 at 7. Nonetheless, at the expiration of the TPP, Litton reported an escrow shortage of $532.39. *See* Compl. Ex.11.

On January 1, 2011, Litton transferred the servicing rights to the loan to Green Tree. Plaintiff's first monthly statement from Green Tree indicated a principal balance of $231,322.37, but also sought a $10,470.45 payment for her current payment, escrow, late charges, and past due payment. Plaintiff disputed the amount owed in a series of letters to Green Tree. As the back and forth continued, Green Tree stopped accepting Plaintiff's loan payments and returned two checks from May and June 2011. It is unclear if Nash continued to make payments or if Green Tree has

continued to reject those payments. On November 9, 2011, Commonwealth notified the Plaintiff

that it had been appointed substitute trustee in June 2011 and that her home was scheduled for

foreclosure sale on November 29, 2011. The sale was subsequently cancelled and has not been

rescheduled.

### Standard of Review

Summary judgment is appropriate when the record shows that there is no genuine issue of

material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In

determining whether a genuine issue of material fact exists, the trier of fact must view all facts,

and reasonable inferences drawn therefrom, in the light most favorable to the non-moving party.

*Matsushita*, 475 U.S. at 587. The mere existence of a factual dispute, however, will not defeat

summary judgment. The non-moving party must show that the dispute is genuine and material to

the case; that is, the factual dispute must be capable of affecting the substantive outcome of the

case and supported by sufficiently admissible evidence that a reasonable trier of fact could find

for the non-moving party. *Anderson*, 477 U.S. at 247-48. If the evidence favoring the nonmoving

party is "merely colorable, or is not significantly probative, summary judgment may be granted."

*Id.* at 249-50 (citations omitted). "[A] complete failure of proof concerning an essential element

of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he

moving party is 'entitled to judgment as a matter of law.'" *Celotex Corp.*, 477 U.S. at 323.

**I.     Count I – Breach of Contract**

Plaintiff Nash and Defendant Litton argue in their respective Memorandums in Support

that each is entitled to summary judgment on Count I's breach of contract claim. Litton claims

that Plaintiff is barred from bringing a breach of contract claim under the terms of TPP, relying on the court's determination in *Condel v. Bank of America, NA*, 2012 WL 2673167 (E.D. Va. July 5, 2012). In *Condel*, the court stated, without elaboration, that "most courts have also concluded that a borrower cannot sue for breach-of-contract directly under his TPP agreement – for instance, where a servicer declines to grant a permanent loan modification at the conclusion of the trial period." *Id.* at *6. Litton relies on this holding, arguing that any breach of contract claim must fail, as a matter of law, if brought under a TPP agreement.

In its reliance on *Condel*, Litton fails to recognize the differences between the court's analysis in that case and the facts before this Court. Litton properly claims that courts have consistently held that there is no cause of action for a breach when a servicer chooses to deny a permanent HAMP modification to an applicant. The court in *Condel* provided just such an example in the section cited by Litton. Nonetheless, Plaintiff Nash is not claiming that Litton's denial of its permanent loan modification was a breach of its contractual duties. Instead, Plaintiff claims that Litton failed to uphold its contractual duties as established by the terms of the TPP agreement. Unlike in *Condel*, Plaintiff argues that Litton was required to perform its duties consistent with the terms of the TPP agreement, while that agreement remained in effect, prior to the denial of the permanent modification application. Litton's permissibly subjective determination that Nash's permanent modification should be denied is irrelevant to the Court's consideration of whether or not it violated the terms of the agreement entered into with Plaintiff.

Ultimately, courts have recognized that a plaintiff may bring a private cause of action for breach of contract stemming from a TPP Agreement. *Stovall v. SunTrust Mortg., Inc.*, 2011 WL 4402680 (D. Md. 2011) (citing *Allen v. CitiMortgage, Inc.*, 2011 WL 3425665 (D.Md. 2011) (holding that plaintiffs may assert a breach of contract claim based on TPP Agreement)); *See*

*also Legore v. OneWest Bank, FSB*, 2012 WL 4903087 (D.Md. Oct. 15, 2012). As long as the elements of a breach of contract are satisfied, there is nothing in the terms of the TPP or in any regulation that prevents a plaintiff from bringing such a claim.

As this Court recently summarized, the elements for a breach of contract under Virginia law require: (1) a legally enforceable obligation of a defendant to a plaintiff, (2) the defendant's violation or breach of that obligation, and (3) injury or damage to the plaintiff caused by the breach of obligation. *McInnis v. BAC Home Loan Servicing, LP*, 2012 WL 383590, *6 (E.D. Va. Jan. 13, 2012). Satisfying the first element, Litton sent Plaintiff the TPP application, stating "Let us know if you accept this offer." Plaintiff complied with the offer's instructions and which she signed and delivered the agreement. The terms of the TPP Agreement required that for the contract between the parties to be enforceable Plaintiff must have received the agreement, signed and executed by Litton. While this last step in the process never occurred, Plaintiff, nonetheless, properly relied on Litton's performance once it began sending statements to Plaintiff seeking payments in the TPP-adjusted amount.

Under the second and third elements, Plaintiff must prove that Defendant Litton breached its obligations under the agreement and that its breach caused Plaintiff some injury. Plaintiff argues that Litton breached the terms of the TPP agreement by (a) miscalculating and misreporting the escrow shortages over the life of the TPP, and (b) by failing to properly apply Nash's payments during the life of the TPP. First, Nash argues that, per Litton's notice, the TPP monthly escrow payments were reduced to $253.16 and were reported as causing a $0.00 (zero) shortage in the escrow funds owed. Furthermore, the TPP provided that any escrow balance could be paid over a five-year period. *See* TPP Offer Letter at 4. After the TPP expired, however, Litton reported to Nash that she had an escrow shortage of $532.39, which would be

collected over a one-year period. Furthermore, Nash claims that this breach resulted in her having to pay increased monthly payments following the denial of her permanent modification from $1,999.27 to $2,047.68.

Second, Nash argues that Litton breached its duties under the agreement when it held Plaintiff's initial TPP payments from February and subsequent months in a "suspense account." Under the terms of the TPP, Litton promised to hold Nash's payments "received during the [TPP] until they total an amount that [is] enough to pay the oldest delinquent monthly payment on [her] loan in full." TPP at 7. At the time, however, Nash had no delinquent monthly payments. She argues that the full amount of the initial TPP payment should have immediately been applied to the underlying loan payment, interest, and escrow for February 2010, rather than held in a suspense account. This withholding caused an increase in the amount of delinquent payments owed by Nash.

In response, Litton explains that the TPP payments Nash initially made were necessarily less than the full amount owed on the underlying loan. As a result, Litton had to hold that initial payment in a suspense account until the next month's TPP payment could be added to make up for the deficiency. Undoubtedly, the terms of the TPP agreement allow Litton to withhold the TPP payments in a suspense account when there is a delinquency, but the plain language of the TPP agreement is silent when it comes to Litton's obligation when the borrower, like Nash, has no delinquent monthly payments.

The Court finds that under certain circumstances, a TPP Agreement can represent an enforceable contract between the parties. In this case, the facts support a finding that a breach of contract may have occurred. That question, however, is best left to the finder of fact. At this

9

time, summary judgment is not appropriate.  Defendant's Litton's and Plaintiff Nash's motions for summary judgment are denied.

## II.    Count II – Tortious Interference with the Contract

In Count II, Plaintiff contends that Litton tortiously interfered with the contract initiated in 2007 between Plaintiff and Lender, Fannie Mae.  Both Plaintiff and Defendant Litton seek summary judgment on this Count.  To give rise to an action for tortious interference, the following elements must be satisfied:  (1) The existence of a valid contractual relationship or business expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing the breach or termination of the relationship or expectancy; and, (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Ratledge v. Science Applications Int'l Corp.*, 2011 WL 652274, *4 (E.D. Va. Feb. 10, 2011).

Plaintiff argues that all four elements of tortious interference with the mortgage loan agreement are satisfied by Litton's actions.  First, Plaintiff establishes a valid contractual relationship exists between herself and her Lender, Fannie Mae.  Second, Litton was clearly aware of the relationship between Fannie Mae and Plaintiff because the loan servicing obligations were transferred from Fannie Mae to Litton in May 2008.  Neither party disputes that the first two prongs of tortious interference are satisfied.  The third and fourth prongs, however, remain at issue.

To satisfy the third prong, Plaintiff must demonstrate that Defendant Litton intentionally interfered with the contract thereby causing a breach or termination of the relationship or expectancy.  Nash points to three acts or omissions that demonstrate Litton's intentional interference.  First, Plaintiff argues that Litton sent the TPP letter to Nash and, but for that

10

communication, Plaintiff would not have made deficient payments and would not have defaulted on the underlying loan. Litton knew that Plaintiff faced imminent financial hardship yet it induced her into accepting the terms of the TPP. Second, Nash argues that Litton intentionally interfered with its contractual relationship with the original lender, Fannie Mae, when Litton instructed her not to make the April 2010 payment, as required by the original loan documents.

Under both set of facts, Plaintiff fails to demonstrate Litton possessed the requisite intent to qualify as tortious interference with the contract. First, there is no evidence that Litton sent Plaintiff the TPP application as part of a scheme to induce Plaintiff's default. Second, there is no evidence that when Defendant sent Plaintiff a statement that claimed no payment was due in April 2010 it did so intentionally. It appears far more reasonable that the inaccurate statement was sent to Plaintiff due to a clerical error.

Finally, Plaintiff claims that the in-house loan modification Defendant offered her after rejecting her permanent modification was inaccurate and an attempt to tortiously interfere with her contractual relationship with Fannie Mae. Undoubtedly, the in-house loan modification sent to Plaintiff contained inaccurate figures purporting to show how much Plaintiff owed on the underlying mortgage after her permanent modification was denied. Nash argues that the inaccurate loan modification offer was not made in good faith. Furthermore, she claims that the fact that the modification offer would not reduce her monthly payments is evidence that Defendant's offer was made in bad faith and was an attempt to solidify the incorrect payment owed and force Plaintiff's default. Nash claims that she contacted Defendant, explaining their mistake and requesting the amount owed be corrected. Defendant even relied on the fact that Plaintiff made such a request and admitted that the modification was amenable, conditioned upon correcting the $2500 discrepancy, as evidence that it did not cause Plaintiff's default.

Nonetheless, Nash claims Litton refused to correct its own error, which would have potentially helped Plaintiff avoid default.

Given that Plaintiff can easily demonstrate damages in satisfaction of the fourth prong, the only remaining issue is whether Litton intentionally induced Plaintiff's default and caused her to incur additional damages due to its allegedly bad faith in-house modification offer and subsequent refusal to correct the errors contained in that offer. This question must be left for the trier of fact. Summary judgment, therefore, would be inappropriate. Both parties' cross-motions for summary judgment are denied.

## III.    Count IV – Declaratory Judgment

On August 10, 2012, this Court issued an Order, Dkt. No. 59, granting Plaintiff's motion to reconsider the Court's order dismissing Count IV, Declaratory Judgment. Count IV was allowed to proceed for the limited purpose of allowing Plaintiff to assert the non-existence of default or any other defense to the acceleration of the note and sale of the property. *See* Dkt. No. 59. Plaintiff seeks a declaratory judgment ruling that she was not in default, relying on the argument that her default was caused by Defendant Litton's breach of contract and tortious interference with her contract with Fannie Mae.

Defendant Green Tree offers several arguments in opposition to Plaintiff's claim that she is not in default on her original loan. First, Green Tree argues that the missed April 2010 payment caused Plaintiff to default on the loan, but only once the TPP agreement expired. Admittedly, Litton sent Plaintiff a monthly statement following the beginning of the TPP, which stated that Nash owed no payment in April 2010. Plaintiff relied on Defendant's representation and no payment was sent from Nash to Litton in April. Defendants nonetheless rely on that missed payment as a reason for Plaintiff's default. Green Tree argues that regardless of whether

12

the April 2010 payment was required under the TPP arrangement, nothing in the TPP agreement altered Nash's obligations on the underlying loan. Nash, therefore, was obligated to pay the missed April 2010 payment immediately upon the termination of the TPP agreement, regardless of when it was due under the TPP agreement, if at all.

Similarly, Defendants argue that Nash defaulted on her loan as soon as she failed to pay the deficiency due upon denial of the permanent loan modification. Green Tree cites the TPP agreement, which states:

> I understand that this Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed.

Nash never received a permanent modification, meaning her underlying loan was never altered by the terms of the TPP or any other agreement she entered into. As a result, Nash's loan documents for her original loan remained in effect.

Fully developing this argument, Defendants would have the Court find that each and every TPP agreement, as a matter of course, results in a default on the underlying loan. The policy purpose behind the temporary HAMP modification program is to allow borrowers to pay a lower monthly amount, typically due to today's lower interest rates. Under the terms relied upon by Defendants, however, as soon as a borrower makes his or her initial TPP payment, an amount less than normally owed on the loan, they are in default. In other words, simply by making a payment in the amount requested in each monthly TPP statement, the borrower cannot avoid default, regardless of his or her precise compliance with the terms of the TPP Agreement. This Court refuses to accept that the TPP program necessarily requires such a veiled pitfall for borrowers when the resulting default has been induced by the loan servicer. This logic contradicts the purpose of TPP agreements and would result in perverse incentives for servicers

13

to induce default where none existed prior to its involvement.  The borrower instead is protected by the promise of a permanent modification if the borrower complies with the prerequisites, pursuant to the TPP contract.

Finally, Nash argues that she should not be in default because Litton improperly accelerated the delinquent payments owed following the rejection of her permanent modification. When Litton sent the TPP agreement, Nash claims she relied on the representations made in the offer document as well as the accompanying "important program information" and "frequently asked questions" documents.  In addition to the words, "LET US KNOW IF YOU ACCEPT THIS OFFER," the TPP agreement offer included a section entitled "FREQUENTLY ASKED QUESTIONS."  This section included the following information:

Q.   What if my trial period payment is less than the payment I currently owe on my loan?
We will add the difference between the monthly payment that you currently owe on your loan and the trial period payment to your loan balance and allow you to pay it over the remainder of the modified term.

Q.   What do you do with my first trial period payment if I do not qualify for the program?
Your first trial payment will be applied to your existing loan in accordance with the terms of your loan documents.  If you don't qualify for the program, we will help evaluate other options to help you keep your home or ease your transition to a new home."

Nash relied on these representations when arguing that the delinquency payments owed once Litton refused to permanently modify her loan should have been amortized over the remaining life of the loan.  Instead, Litton demanded payment of the entire delinquency payment immediately upon its rejection of Plaintiff's permanent HAMP modification.  In addition, as part of its in-house modification offer following the rejection, Litton represented that the unpaid principal balance was approximately $2,500 more than was actually owed.

14

As noted by Green Tree, the "frequently asked questions" section is not incorporated by reference in the TPP agreement and cannot be relied upon by Nash. Additionally, Green Tree correctly explains that the language of the "frequently asked questions" section allows for delinquency payments to be amortized over the remaining life of the loan, but only for a loan that has been permanently modified. That said, there is no language provided within the TPP agreement governing what is to be done with delinquency payments when a temporary loan modification is agreed to, but a permanent modification is later denied. If a borrower satisfies every requirement under a TPP, yet is denied a permanent modification, the TPP agreement is silent as to how a borrower repays any delinquencies. As such, the Court is without sufficient information to determine that Plaintiff's failure to pay the full amount of the delinquency upon the rejection of her permanent modification, rather than over the remaining life of the original loan, should require default.

At this time, summary judgment would be inappropriate. For the reasons stated herein, Plaintiff's Motion for Summary Judgment as to Count IV is DENIED and Defendant Green Tree's Motion for Summary Judgment as to Count IV is DENIED.

## IV.    Count VI – Violations of the Real Estate Settlement Procedures Act (RESPA)

Plaintiff alleges in Count VI of her Amended Complaint that Green Tree violated the Real Estate Settlement Procedures Act ("RESPA") by (1) failing to investigate and properly respond to Plaintiff's Qualified Written Requests ("QWRs") as required by 12 U.S.C. § 2605(e) and (2) continuing to report Nash's default to consumer reporting agencies after receipt of certain QWRs. "RESPA is a consumer protection statute, and on summary judgment [the court] must view the facts in the plaintiff's favor." *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 688 (7th Cir. 2011). The definition of a QWR includes a written correspondence that "(i) includes, or

otherwise enables the servicer to identify the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B). It is uncontested that each of the letters includes, at a minimum, Plaintiff's name and account number as well as an inquiry. Nash asserts that under the statute's definition, Plaintiff's letters trigger Green Tree's obligation to respond.

Green Tree counters Plaintiff's assertions, arguing that Nash's letters lack sufficient detail or otherwise do not qualify as QWRs and, even if considered QWRs, Green Tree had established a separate and exclusive office where Plaintiff was directed to send any QWRs. The Department of Housing and Urban Development ("HUD") promulgated regulation 24 C.F.R. § 3500.21, which provides that "by notice either included in the Notice of Transfer or separately delivered by first-class mail, postage prepaid, a servicer may establish a separate and exclusive office and address for the receipt and handling of qualified written requests." *Id.* Relying on this regulation, Green Tree provided for a separate and exclusive QWR office in the January 3, 2011 Notice of Assignment, Sale or Transfer of Servicing Rights that it sent to Plaintiff. Buried[3] in the last lines of Section 6 of the Notice is the sentence "If you want to send a "qualified written request" regarding the servicing of your loan to your new servicer, it must be sent to this address: *Green Tree, PO Box 6176, Rapid City, SD 57709-6176.* To insure timely posting of your payments, please send them to the payment address indicated on Page 1." The statute and controlling case

---

[3] The Notice of Assignment, Sale, or Transfer of Servicing Rights letter sent from Green Tree to Nash, includes seven addresses. One of the addresses, the payment services address, is listed twice. Of the seven addresses, six are listed out separately within the document, bolded and centered on the page. The only address that is not presented separately from a paragraph, bolded and centered is the alleged separate and exclusive QWR office address in the third paragraph of the "Notice About Your Rights" section of the letter. The QWR office address is PO Box 6176, Rapid City, SD; whereas, the bill payment services office is PO Box 6172, Rapid City, SD.

law do not directly address Green Tree's obligations under 12 U.S.C. § 2605 when a borrower continues to send QWRs to the customer service or payment centers. In particular, it is unclear if Green Tree's use of a P.O. Box, presumably at the same location and with only one digit difference from that of the payment services P.O. Box, satisfies the establishment of a *separate* and exclusive office for QWRs.

Plaintiff admits that none of the QWRs sent to Green Tree were mailed to this QWR P.O. Box. Instead, Nash sent her correspondences to the same address where she sent her payments. Nonetheless, several of Nash's letters were answered in a timely manner. The letters in question are as follows:

1. January 12, 2011 Letter from Nash. Green Tree acknowledges receipt.

2. February 14, 2011 Letter from Nash. Green Tree denies receipt of the letter.

3. February 22, 2011 Letter from Nash. Green Tree acknowledges receipt.

4. March 15, 2011 Letter from Nash. Green Tree denies receipt of the letter.

5. April 6, 2011 Letter from Nash. Green Tree denies receipt of the letter.

6. April 8, 2011 Letter from Nash. Green tree acknowledges receipt.

7. May 31, 2011 Letter from Plaintiff's Counsel to Green Tree, Rosenberg & Associates, and Litton. Green Tree acknowledges receipt and properly responded.

8. June 27, 2011 Letter from Plaintiff's Counsel to Green Tree. Green Tree acknowledges receipt, but allegedly failed to properly investigate request.

9. September 12, 2011 Letter from Plaintiff's Counsel to Green Tree. Green Tree acknowledges receipt but denies that the correspondence triggers RESPA.

10.     November 2, 2011 Letter from Plaintiff's Counsel to Green Tree. Green Tree

acknowledges receipt but responded by refusing to accommodate Plaintiff

Counsel's request.

Of the six letters sent from Plaintiff to Green Tree, Green Tree acknowledges that they

received three of the letters at the address Plaintiff sent them and responded to them. Green Tree

denies receiving the other three letters from Nash and did not respond to them or properly

investigate the issues presented in the letters. While Plaintiff and Green Tree present several

cases purporting to support their respective positions, none of the cases control the question

before this Court and most are distinguishable from the facts of this case.[4]

While the law applicable to the RESPA dispute in this matter provides statutory support

for Plaintiff on the one hand, and the regulation supports the position of Defendant Green Tree

on the other, there remain significant material issues to be resolved by the trier of fact. It is

unclear (a) whether three of the six letters allegedly sent by Nash were, in fact, sent and received

by Green Tree, (b) whether those correspondence contained sufficient detail to satisfy the

definition of Qualified Written Requests, (c) whether or not Green Tree properly investigated and

answered Plaintiff's inquiries, and finally, (d) whether Green Tree's attempt to establish a

separate and exclusive QWR office satisfied the requirements of the statute and HUD regulation.

Having found the existence of genuine issues of material fact for the reasons stated

herein, Plaintiff Nash's Motion for Summary Judgment as to Count VI is DENIED. Similarly,

Defendant Green Tree's Motion for Summary Judgment as to Count VI is DENIED.

---

[4] *See e.g. Carter v. Countrywide Home Loans, Inc.*, 2009 WL 2742560 (E.D. Va. 2009)
(correspondence sent to an agent for the Lender may be considered a received QWR); *McLean v. GMAC Mortgage*, 2008 WL 5246149 (S.D. Fla. 2008) (denying summary judgment where the correspondence was sent first to Defendant's bankruptcy counsel, who failed to advise Plaintiff of correct address, and then forwarded to Defendant);

**V.     Count VIII – Violations of the Fair Debt Collection Practices Act ("FDCPA")**

Plaintiff alleges that Defendant Green Tree violated 15 U.S.C. 1692c(a)(2), the Fair Debt

Collection Practices Act. In relevant parts, the statute provides that:

> "Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the collection of any debt—
> …(2) if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication.

*Id.* It is undisputed that on May 31, 2011, Nash's counsel sent letters to Green Tree and counsel

for Green Tree, Rosenberg & Associates, notifying them of his representation of Nash. The

letter stated, "We fully expect all dunning (phone calls, letters, etc., with the exception of those

statutorily required) of our client to cease from this point forward and all communications will be

with our office." The only analysis left for the Court is to determine if the alleged

communications were in connection with the collection of any debt. To do so, courts consider

the following factors: (1) whether the "animating purpose" of the communication was to induce

payment; (ii) the purpose and context of the communications, viewed objectively, and (3)

whether the communication was in response to a request of the debtor. *Penn v. Cumberland*, 883

F.Supp.2d 581 (E.D. Va. July 25, 2012) (citing *Gburek v. Litton Loan Servicing LP*, 614 F.3d

380 (7th Cir. 2010)).

It is necessary to assess each of the alleged violations individually. Nash alleges that

Green Tree, directly and vicariously, violated the FDCPA on nine occasions: (i) June 13, 2011

visit from Five Brothers, (ii) June 14, 2011 letter from Rosenberg & Associates to Nash, (iii)

June 16, 2011 letter from Rosenberg & Associates to Nash, (iv) September 2, 2011 letter from

Green Tree to Nash, (v) September 8, 2011 letter from Green Tree to Nash, (vi) October 14,

19

2011 letter from Green Tree to Nash, (vii) November 3, 2011 letter from Green Tree to Nash,

(viii) January 4, 2012 letter from Green Tree to Nash, and (ix) October 25, 2012 letter from

Green Tree to Nash.[5]

### A.    Five Brothers Visit

On June 13, 2011, Green Tree hired Five Brothers, a default management company,

under an Initial Secure Order.  Green Tree maintains that the Order contained the following

directions:

> "HOME IS VACANT. PLEASE COMPLETE SECONDARY INITIAL SECURE AND
> TAKE PHOTOS OF DAMAGED AREAS IN NEED OF IMMEDIATE REPAIR. IF
> PROPERTY IS OCCUPIED AND IS LISTED OR HAS A FOR SALE SIGN DO NOT
> PROCEED WITH THIS ORDER. THANKS."

*See* Nash Opp., Ex. 4 at 5 (emphasis original).  According to both parties, an employee of Five

Brothers went to Nash's home at the direction of Green Tree, believing no one was home.  When

Nash heard the noises at the front door around 9:00 p.m., she called the police.  When she

eventually spoke with the Five Brothers employee, Nash testified that the employee told her he

was with Five Brothers, confirmed that Nash was occupying the premises, told Nash he was

there to change the locks and then left without changing the locks.  At no point during the visit

did Green Tree's agent reference the debt or demand payment.  Green Tree argues that the

employee had no knowledge of the debt. The animating purpose, therefore, could not have been

the collection of debt.

---

[5] Green Tree addresses additional communications in its Memorandum in Support of its Motion
(Dkt. No. 89 at 27) that Nash alleges violated FDCPA: (1) October 21, 2011 letter from Green
Tree to Nash, (2) December 19, 2011 letter from Green Tree to Nash, and (3) telephone
communications between Green Tree (or its agents) and Nash between October 2011 and
December 2011.  Plaintiff does not address these communications in its Opposition.  Those
communications, therefore, are assumed not to have violated the FDCPA.

Plaintiff rejects Green Tree's conclusions and argues that the animating purpose of the Five Brothers visit was to induce payment of the debt through threat of lock out and foreclosure. Plaintiff asserts that there need not be an explicit demand for money. It is a violation of the FDCPA as long as the communication is made "specifically to induce the debtor to settle her debt." *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380 (7th Cir. 2010). Here, Nash argues that where the Plaintiff is a single female living alone and Green Tree sends an agent to threaten her with being locked out of her home, the animating purpose of that visit is to induce payment of the debt.

The matter before the Court turns on the objective assessment of the animating purpose behind the Five Brothers visit to Nash's residence. Ultimately, the trier of fact is left with the choice to believe either Green Tree's version of the story—that the initial secure order was simply part of its duty to secure an abandoned property, despite conflicting reports about whether the property was occupied;[6] or Plaintiff's assessment of the communication—that it was an attempt to induce payment on the debt through an in-person confrontation. This determination is best left to the trier of fact. Summary Judgment is not appropriate on this issue.

## B.  June 14 and June 16, 2011 Letters from Rosenberg & Associates

On or about April 27, 2011, Green Tree hired the law firm of Rosenberg & Associates, LLC ("Rosenberg") to represent Green Tree during the foreclosure sale of Plaintiff's home. On June 14, 2011 and June 16, 2011 Rosenberg sent letters to Plaintiff that may have violated the FDCPA and for which Green Tree may be vicariously liable. The June 14 letter states that the amount required for Nash to pay off the loan is $242,164.21 and that the figure "is good through

---

[6] The report from Five Brothers dated June 3, 2011 indicated that the utilities were still turned on, but improperly concluded after an exterior visual inspection that the property was vacant. Dkt. No. 123, Ex. 4 at 50.

July 13, 2011." The letter also states in bold, "This is an attempt to collect a debt. Any information obtained will be used for that purpose." Dkt. No. 115-22 at 3. Similarly, the June 16, 2011 letter from Rosenberg states that the amount required to be paid to reinstate the loan is $19,258.50. *Id.* at 4. This letter also contains the language, "This is an attempt to collect debt."

Under general principles of agency, Green Tree may be held liable for the FDCPA violations of Rosenberg. Courts have consistently held that for a principal to be vicariously liable, it must exercise control over the conduct and activities of the agent. *Clark, et al. v. Capital Credit & Collections Services, Inc. et al.*, 460 F.3d 1162, 1173 (9th Cir. 2006) (citing *Restatement Second of Agency* § 1). Green Tree argues that it did not exercise control over Rosenberg sufficient to find liability. Instead, Green Tree claims it relied on Rosenberg's judgment, discretion, knowledge and expertise as how to properly handle and conduct the foreclosure sale, protecting it from liability. *Cassady v. Union Adjustment Co., Inc., et al.*, 2008 WL 4773976 (N.D. Cal. 2008). Green Tree maintains that it did not send the letters, did not request or authorize the letters, and lacked any knowledge that the letters were being sent.

Plaintiff argues that Green Tree exercised sufficient control over Rosenberg through its attorney-client relationship and conduct. Specifically, Plaintiff points to internal Green Tree notes, which indicate that on June 13, 2001—the day before the first Rosenberg letter was sent to Nash—Green Tree sent the details concerning Nash's loan to Rosenberg, including the same restatement figures that appeared in the June 16 letter, and noted a "follow up" date of June 16. Plaintiff also claims that Green Tree's notes from June 13 indicate a service request was sent to Rosenberg for a "special letter request." *See* Ex. 1 to Plaintiff's Am. Motion for SJ at 13.

Green Tree maintains that none of the notes, comments, or requests cited by Plaintiff as evidence of control demonstrate any actual control beyond the typical attorney-client

relationship.  Plaintiff, however, has offered substantive evidence to demonstrate Green Tree

exercised direct control over Rosenberg leading up to the June 14 and 16 letters, in violation of

the FDCPA.  The issue of control remains at issue regarding the Rosenberg letters.  Thus,

Summary judgment is inappropriate at this stage.

      C.      **Account Representative Letters from September 2, 2011; September 8, 2011; and January 4, 2012**

On September 2 and 8, 2011 and January 4, 2012, Green Tree sent Nash three letters that

notified Plaintiff of her account representative and directed her to a telephone number and

website where she could review her account information.[7]  As stated, the FDCPA "does not

apply to every communication between a debt collector and a debtor." *Grden*, 643 F.3d at 173.

The animating purpose of the communication must be to induce payment of the debt. *Id.*  Green

Tree argues that the relationship between itself as loan servicer and Nash as borrower required

that it notify Plaintiff about the identity and contact information for her account representative.

Unlike the letters from Rosenberg, the Account Representative letters do not demand payment or

list an amount owed under the debt.  Nor do the letters contain the warning "This is an attempt to

collect a debt."

Plaintiff argues the letters were not part of the duty to notify her of her account

representative, but were an attempt to solicit a call from Nash in an effort to collect the money

owed on the dept.  Green Tree had already stopped accepting Nash's payments and was only

---

[7] The September 2, 2011 letter accurately represents the substance of the three letters.  It stated:
    Green Tree would like to notify you of your assigned account representative, effective 9/02/2011.  If you have any questions concerning your account, please contact your account representative…You may also review your account information at www.gtservicing.com.  If you have any questions regarding this letter, please call or write to the above referenced phone number and address.
    We look forward to continuing to serve you.

willing to accept the amount due to bring the account current. Plaintiff concludes, therefore,

"[t]here is no other reason she would have been contacted," other than to induce her payment.

Nash Opp. At 29.

Under the FDCPA, Nash has the burden of demonstrating the connection between the

communication and the attempt to induce payment on the debt. Concluding that there is no other

reason for Green Tree's letters does not satisfy this burden. The Account Representative letters

are not the type of dunning from which the FDCPA seeks to protect borrowers. The loan

servicer may satisfy its duty to provide updated information to a borrower even after a dispute

arises over payment without being subject to statutory violations. In this case, the Account

Representative letters were not sent to Nash as an attempt to induce payment of the debt and do

not violate the FDCPA. As such, Green Tree is entitled to Summary Judgment on this issue.

### D.     FNMA Modification Letters sent on October 14, 2011; November 3, 2011; and October 25, 2012

On October 14, 2011 Green Tree sent Nash a letter stating "[t]he good news...you may

be eligible for a modification offered by Fannie Mae (the owner of your loan). This modification

is designed for borrowers, like you, who...did not meet all of the eligibility criteria for a

permanent modification under [HAMP]." Green Tree SJ Memo, Ex. 15. On November 3, 2011

and October 25, 2012, Green Tree sent Nash follow-up letters stating that Nash was "at risk of

losing eligibility for a Loan Modification due to the requirement of the Trial Period Plan." *Id.*,

Ex 16. The letters go on to list potential options for Nash and provide contact information if she

wishes to pursue the non-HAMP modification.

Green Tree relies on the court's analysis in *Bailey v. Sec. Nat'l Servicing Corp.*, which

determined that a letter similar to those sent to Nash was not sent in connection with the

collection of any debt. *See Bailey*, 154 F.3d 384 (7th Cir. 1998). Like the FNMA Modification

24

letters sent by Green Tree, the letter in *Bailey* did not contain a demand for money or imply that anything was owed under the debtor's forbearance agreement. "A warning that something bad might happen if payment is not kept current is not a dun, nor does it seek to collect debt, but rather the opposite because it tries to prevent the circumstance wherein payments are missed and a real dun must be mailed." *Id.* at 389.

Plaintiff seeks to distinguish *Bailey* from the FNMA Modification letters by arguing that the letter sent in *Bailey* was related to a forbearance agreement, not a loan modification or a loan in default. The loan modification would cause Nash's purported arrears to be added to her loan balance, along with the fees Green Tree was attempting to collect. The modification offer, therefore, was connected to its intent to collect the underlying debt.

The distinction relied upon by Plaintiff does not sustain its FDCPA claim. The FNMA Modification letters sent by Green Tree do not bear any of the tell-tale signs of a communication in violation of FDCPA. The letters do not demand payment, but simply allow Nash one last opportunity to modify her loan through her lender, Fannie Mae. The animating purpose of the letters is not to induce payment of the debt. Green Tree, therefore, is entitled to Summary Judgment on this issue.

Having found that several of the correspondences with Defendant present the Court with genuine issues of material facts that are appropriate to have considered by the ultimate trier of fact, other interactions between Defendant Green Tree and Plaintiff Nash clearly do not rise to the level of a violation of the Fair Debt Collection Practices Act. As such, Plaintiff Nash's Motion for Summary Judgment as to Count VIII is DENIED.

Defendant Green Tree's Motion for Summary Judgment as to Count VIII is DENIED IN PART and GRANTED IN PART. (1) As pertains to the Five Brothers visit to Plaintiff's

residence, Green Tree's Motion is DENIED. (2) As pertains to the letters sent from Rosenberg & Associates on June 14 and 16, 2011, Green Tree's Motion is DENIED. (3) As pertains to the Account Representative letters from to Nash on September 2 and 8, 2011 and January 4, 2012, Green Tree's Motion for summary Judgment is GRANTED.  (4) As pertains to the FNMA Modification letters sent to Nash on October 14 and December 3, 2011 as well as on October 25, 2012, Green Tree's Motion for Summary Judgment is GRANTED.

### Conclusion

For the reasons stated herein and for good cause shown, Defendant Commonwealth's Motion for Summary Judgment is GRANTED; Defendant Litton Loan's Motion for Summary Judgment is DENIED IN PART and GRANTED IN PART; Defendant Green Tree's Motion for Summary Judgment is DENIED IN PART and GRANTED IN PART; and, Plaintiff's Motion for summary Judgment is DENIED.

An appropriate order shall issue.

May 2, 2013
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge

26